IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 4, 2020

**IN RE: KAMBRI P. ET AL.**

**Appeal from the Juvenile Court for Dickson County**
**No. 10-18-134-DN   Michael Meise, Judge**

_____

**No. M2019-01352-COA-R3-PT**

_____

This is a termination of parental rights case.  Appellants, mother and father, appeal the trial court's termination of their respective parental rights to the two minor children.  The court terminated mother's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) failure to substantially comply with the requirements of the parenting plans; and (3) persistence of the conditions that led to the children's removal.  The trial court terminated father's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) abandonment by an incarcerated parent by wanton disregard; (2) persistence of the conditions that led to the children's removal; and (3) severe child abuse.  The trial court also found that termination of appellants' parental rights was in the children's best interest.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and RICHARD H. DINKINS, J., joined.

Blake C. Kruse, Dickson, Tennessee, for the appellant, Roman P.[1]

Tammy L. Hassell, Charlotte, Tennessee, for the appellant, Brittney S.

Herbert H. Slatery, III, Attorney General and Reporter, and Jeffrey D. Ridner, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

## OPINION

## I. Background

Brittney S. ("Mother") and Roman P. ("Father," and together with Mother, "Appellants") are the biological parents of the minor children, Kambri P. (d.o.b. September 2014) and Jasmine P. (d.o.b. November 2016) (together the "Children"). Appellee Tennessee Department of Children's Services ("DCS") became involved with this family on July 17, 2017, when it received a referral alleging that the Children and their half-siblings, Nichole and Delila,[2] were inadequately supervised and possibly exposed to drugs. At the time, Mother, Father, and the Children were living with Nichole and Delila's father, Ray S.

During the initial DCS investigation, Mother disclosed that she drank alcohol, smoked marijuana, and took Suboxone that she received from a neighbor.[3] DCS administered a drug test, and Mother tested positive for Suboxone. Father admitted that he drank alcohol, smoked marijuana, and also took the Suboxone from the neighbor. Father tested positive for marijuana and Suboxone. At the conclusion of this first interaction, Mother and Father agreed to participate in services offered by DCS.

Ten days later, on July 27, 2017, DCS received a second referral alleging sexual abuse of Nichole by Father. During a forensic interview, Nichole disclosed that Father touched her inappropriately. Father subsequently pled no-contest to aggravated sexual battery of Nichole and received a six year sentence.

DCS received a third referral on August 12, 2017. By that time, Mother, Father, and the Children had left Ray S.'s home and were living in a motel. Law enforcement was called to the motel after the Children were discovered by housekeeping. The Children were alone with Father, who was asleep. An empty vodka bottle was found on the nightstand.

As a result of these referrals and interactions with the family, DCS filed a Petition for Order Controlling Conduct and for Protective Supervision in the Juvenile Court of Dickson County ("trial court") on October 5, 2017. The Children were not removed at this time. Before an adjudicatory hearing could be held, the guardian ad litem moved the trial court to review the case because Mother had been non-compliant with services, the whereabouts of the Children were unknown, and DCS was unable to contact Appellants. Based on the motion and concerns that Father committed severe abuse, the trial court

---

[2] The Children's half-siblings, Nichole S. and Delila S., were included in the underlying dependency and neglect proceeding until custody was placed with their father, Ray S. Accordingly, Nichole S. and Delila S. are not included in the termination action.

[3] Suboxone is an opioid.

found probable cause that the Children were dependent and neglected and entered an order granting temporary custody to DCS on December 6, 2017.

The first family permanency plan was created on January 3, 2018 with a goal of returning the Children to their parents. Neither parent was present for its formation. However, after Father was incarcerated in December of 2017, the DCS case manager came to the jail, reviewed the permanency plan with him, and asked him to participate in available services. Under the plan, both parents were required to: (1) pay $50.00 per month in child support; (2) complete drug and alcohol assessments and follow all recommendations; (3) complete mental health assessments and follow all recommendations; and (4) complete domestic violence education classes. Father was also required to submit to random drug screens and complete a psychological evaluation. Mother had the additional requirements to: (1) participate in counseling and case management; (2) complete a psychological evaluation; (3) obtain stable housing; (4) submit to random drug screens; and (5) take medication as prescribed. Appellants were allowed phone calls and supervised visits with the Children. The trial court ratified the plan on March 14, 2018 and found that Appellants' respective requirements were reasonable, were related to remedying the conditions that led to the Children's removal, and were in the Children's best interests. At the hearing on the petition to terminate Appellants' parental rights, DCS case worker, Shauna Lowry, summarized the desired outcomes of the plan: "[t]hat the parents obtain and maintain sobriety, have stable housing, to be able to interact appropriately, and be emotionally stable."

Ms. Lowry reviewed the permanency plan obligations with Mother on multiple occasions and provided her a copy of the criteria and procedures for termination of parental rights on March 26, 2018. Ms. Lowry testified that there were multiple and consistent reminders provided to Mother concerning her requirements under the plan and stated: "I always made sure that [Mother] had a copy and understood the tasks and importance of completing those tasks." In addition, Ms. Lowry referred Mother for services, made numerous phone calls, text messages, and face-to-face visits. Father testified that DCS workers visited him at jail five times and acknowledged that DCS made him aware of his responsibilities under the plans.

Mother requested assistance with detoxification in April of 2018. Ms. Lowry made numerous telephone calls for her admission to an appropriate facility and transported her to the facility. After the detoxification program, Mother immediately went to a drug treatment program for continued treatment for her drug abuse, but she left that program against medical advice. DCS administered drug screens, and offered Mother transportation to and from appointments and visits with the Children. In 2019, after Mother began efforts to comply with the plan, Ms. Lowry transported Mother to an alcohol and drug assessment and a mental health appointment.

The second family permanency plan was created on June 26, 2018. Mother participated by phone. Because the Children had been in DCS custody for over six months and both parents had made only minimal progress on the prior plan, the new plan goals were changed to reunification or adoption. Appellants' responsibilities and requirements under the second plan remained largely unchanged from the first plan, and the Appellants' were given the additional requirements to not engage in illegal activity and to follow the rules of probation and/or parole. Mother received an explanation and copy of the criteria and procedures for termination of parental rights on March 26, 2018. Father received an explanation and copy of the criteria and procedures for termination of parental rights on March 14, 2018.

By order of July 16, 2018, the trial court adjudicated the Children to be dependent and neglected and found that they were the victims of severe child abuse. The trial court made several findings to support its determination. Both parents admitted to illegal use of Suboxone. Father admitted that he was discovered passed out while supervising the Children, and he acknowledged he had a drug and alcohol problem. Neither parent complied with services provided by DCS. Mother testified she had no stable housing, had mental health issues from her childhood, and did not believe Nichole's disclosures of sexual abuse by Father. Finally, the trial court found that based on Mother's testimony and the forensic interviews, Father had perpetrated severe child abuse pursuant to Tennessee Code Annotated section 37-1-102. The Children remained in DCS custody, and Mother was granted supervised visits.

Both Appellants have a history of criminal activity. On January 28, 2016, Mother was convicted of promoting the manufacture of methamphetamine, a class D felony. Mother received three years of probation. After the Children were removed in December of 2017, Mother was incarcerated three times: twice for driving without a license and once for violating the terms and conditions of her probation. As a result of her probation violation, Mother was sentenced on May 17, 2018. Mother's most recent incarceration prior to trial was in November of 2018 when she was incarcerated for one day for failure to appear. She was still on supervised felony probation at the time of the hearing on the petition to terminate her parental rights.

In March of 2016, in Williamson County, Father was placed on probation for initiation of the manufacture of methamphetamine. Father subsequently violated his probation due to the allegations of sexual abuse against Nichole. Father entered a no-contest plea to attempted aggravated sexual battery of Nichole and received a six-year sentence. As a consequence of his plea, Father was placed on the Sex Offender Registry. Father was initially incarcerated in the Dickson County jail from December 15, 2017 until March 11, 2019; thereafter, he was incarcerated in Williamson County where he remained at the time of the hearing on the petition to terminate his parental rights. Father testified that he enrolled in several programs available at the jail and claimed that he would be released from jail within the month. However, further inquiry revealed that

Father was being held without bond for an amended probation violation after entering the no-contest plea to attempted aggravated sexual battery.

On October 9, 2018, DCS filed a petitioned to terminate Appellants' respective parental rights to the Children. The trial court heard the petition on April 22, 2019. By order of July 19, 2019, the trial court terminated Mother's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with the permanency plans; and (3) failure to remedy persistent conditions preventing reunification. The trial court terminated Father's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) abandonment by exhibiting a wanton disregard for the welfare of the Children; (3) failure to remedy persistent conditions preventing reunification; and (4) severe child abuse. The trial court also determined that terminating the rights of both parents was in the Children's best interests. Mother filed her notice of appeal on July 26, 2019; Father filed his notice of appeal on August 14, 2019.

## II. Issues

We state the dispositive issues as follows:

1. Whether there is clear and convincing evidence to support at least one of the grounds relied upon by the trial court to terminate each appellant's respective parental rights.
2. Whether termination of appellants' respective parental rights is in the Children's best interests.

## III. Standard of Review

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious

- 5 -

harm to a child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also **Santosky v. Kramer***, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982); ***In re Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. ***Santosky***, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); ***In re Valentine***, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***In re M.J.B***., 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***In re Carrington H***., 483 S.W.3d at 523-24 (citing ***In re Bernard T.***, 319 S.W.3d 586, 596 (Tenn. 2010); ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009); ***In re Adoption of A.M.H***., 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. ***In re M.L.P.***, 281 S.W.3d at 393 (quoting ***In re Adoption of A.M.H.***, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. ***In re Angela E***., 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Furthermore, if the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). Therefore, this Court "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV. Grounds for Termination of Parental Rights

Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n. 14 (Tenn. 2010). Accordingly, we will review all of the foregoing grounds.

### A. Abandonment by Failure to Provide a Suitable Home

We begin with the ground of abandonment generally. In pertinent part, Tennessee Code Annotated section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . .

Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as follows:

> (ii)(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(ii)

"A suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). A suitable home requires "[a]ppropriate care and attention . . . to the child." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). The home must also "be free of drugs and domestic violence." *In re Hannah H.*, 2014 WL 2587397, at *9.

As set out in context above, Tennessee Code Annotated Section 36-1-102(1)(A)(ii)'s definition of abandonment requires DCS to make reasonable efforts to assist the parent to establish a suitable home. DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal." *In re Kaliyah S.*, 455 S.W.3d 533, n. 34 (citing Tenn. Code. Ann. § 36-1-102(1)(A)(ii)). "[P]arents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from custody." *In re Shameel S.*, No. E2014-00294-COA-R3-PT, 2014 WL 4667571, at *5 (Tenn. Ct. App. 2014 (quoting *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006), *overruled on other grounds* by In re Kaliyah S., 455 S.W.3d 553 (Tenn. 2015)).

In its order terminating their parental rights, the trial court found that despite reasonable efforts by DCS, there was clear and convincing evidence to support termination of Mother and Father's respective rights on the ground of abandonment by failure to provide a suitable home, to-wit:

Kambri and Jasmine were removed from the [Appellants'] home on December 6, 2017. Since the children were removed, [Mother] has lived in at least five places, was incarcerated at least 3 times, moved from place to place, and at the time of hearing was planning on moving into yet another home. She has used methamphetamine and suboxone throughout the time the children have been in custody and chose not to obtain treatment as recommended by her alcohol and drug assessment. [Father] was incarcerated since December 15, 2017. He entered a plea of nolo contend[e]re on April 23, 2019, to the charge of Attempted Aggravated Sexual Abuse where his daughters' half-sibling, who is now 8 years of age, is the victim. Although he has participated in some classes offered at the local jail, he has failed to provide a suitable home for his children. The Department made reasonable efforts to assist the parents in establishing a suitable home, including case management services, offers of random drug screens, a psychosexual evaluation for [Father], alcohol and drug assessment for [Mother], and transportation.

Based on the facts set forth above, the Court concludes and finds that grounds for termination of parental rights do exist as to [Mother and Father] by clear and convincing evidence, pursuant to T.C.A. §36-1-113(g)(1). [Mother and Father], despite reasonable efforts from the Department, have made no reasonable efforts themselves to provide a suitable home for their minor children and have failed to make even minimal efforts to improve their home and personal condition, which demonstrates a lack of concern for the children to such a degree that it appears unlikely that they will be able to provide a suitable home for their children at an early date.

The evidence supports the trial court's findings. The Children's first interaction with DCS occurred on July 17, 2017, when DCS received a referral alleging that the Children and their half-siblings were inadequately supervised and drug-exposed. During the initial DCS investigation, Mother and Father admitted to drug use. Ten days later, on July 27, 2017, DCS received a second referral alleging sexual abuse of Nichole by Father. DCS received a third referral on August 12, 2017. DCS filed a petition on October 5, 2017, alleging that the Children were dependent and neglected. On December 6, 2017, the Children were removed from Appellants' custody.

Father was incarcerated at the time of the hearing on the petition to terminate his parental rights. Before his incarceration, and as discussed below, Father failed to provide a safe and stable home for the Children. He engaged in a transient lifestyle, participated in illegal drug use, abused alcohol, and placed the Children in danger on numerous occasions, i.e., Father was discovered passed out due to overuse of alcohol while the Children were in his sole care. Due to his incarceration, Father has been unable to establish a home. Furthermore, there is no evidence to suggest that he is free of his drug and alcohol addiction. Father's molestation of the Children's half-sister evinces his

potential to place these Children in similar danger. This is especially true in view of the lack of evidence that Father has addressed the sexual abuse in any real or substantial way. In short, there is no indication that Father will be able to provide a safe and suitable home at any near date. As such, we conclude that there is sufficient evidence to support the trial court's termination of his parental rights on the ground of abandonment by failure to establish a suitable home.

Turning to Mother, in the four months following the Children's removal, DCS made efforts to assist Mother. A permanency plan was prepared by DCS on January 3, 2018, with a goal of returning the Children to Mother's custody. Ms. Lowry reviewed the permanency plan obligations with Mother on multiple occasions. Ms. Lowry made referrals for services to Mother and numerous phone calls, text messages, and face-to-face visits with her. Mother requested assistance with detoxification in April of 2018. Ms. Lowry arranged for Mother's admission to an appropriate facility, and then transported her to the facility. After the detoxification program, Mother immediately went to a drug treatment program, but she left that program against medical advice. DCS administered drug screens, and provided Mother with transportation to and from appointments and visits with the Children. Despite these efforts on the part of DCS, Mother failed to fully avail herself of the services and opportunities provided. For example, DCS approved Mother for sixty hours of services to work on items in the permanency plans, but she only completed eight hours. Importantly, Mother never completed drug treatment and continued to use drugs throughout the pendency of the case, testing positive for methamphetamine as late as November 2018. She also did not begin mental health treatment until two months before the hearing on the petition to terminate her parental rights. When asked why she completed so little, she answered, "I'm not sure." From our review, DCS's efforts greatly exceeded Mother's efforts. In short, Mother wholly failed to complete the steps that could have enabled her to establish a suitable home for the Children.

In addition to her failure to comply with counseling and treatment requirements, the record shows that Mother did not establish a suitable physical home for herself or the Children. From the time the Children came into DCS custody on December 6, 2017 until the hearing in April of 2019, Mother estimated she had at least five different addresses. After the Children were removed, Mother moved from place to place. From November of 2018 until February of 2019, Mother lived with her "boyfriend's boss' wife," and then lived with "boyfriend's foreman and his family." In February of 2019, Mother resided with Nathan P., Father's brother and her paramour; they moved from their apartment in April due to potential eviction. At trial, Mother testified that she and Nathan P. were temporarily residing with Nathan P.'s son in Williamson County and planned to move to an unknown address in Portland, Tennessee. Mother provided no proof to substantiate her testimony, and Ms. Lowry testified that Mother gave her numerous potential future addresses that never materialized. For these reason, we conclude that there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on

the ground of abandonment by failure to provide a suitable home.

## B. Abandonment by Father by Wanton Disregard

Father was incarcerated from December 15, 2017 through the date of the hearing on the petition to terminate his parental rights. Tennessee Code Annotated section 36-1-102 defines abandonment by an incarcerated parent as follows:

> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv). Thus, a parent who was incarcerated during all or part of the four months immediately preceding the filing of the termination petition can abandon his or her children by engaging in conduct prior to the incarceration that shows a "wanton disregard" for the children's welfare.

We note that courts are not limited to the four-month period preceding a parent's incarceration to determine whether the parent has engaged in conduct evidencing a wanton disregard for his or her children's welfare. *In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *3 (Tenn. Ct. App. Apr. 11, 2016); *see also Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009) ("parental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration"). However, incarceration itself is not grounds for the termination of a parent's rights, but courts consider the incarceration a "triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866.

In its order terminating Father's parental rights, the trial court made the following findings concerning wanton disregard:

> The testimony provided at the hearing was that [Father] was incarcerated on December 15, 2017, and remained incarcerated at the time of the hearing, which was within four months prior to the filing of the termination petition. He was previously incarcerated from July 15, 2015, to March 24, 2016, when he was convicted of Initiating the Process to Manufacture Methamphetamine. He was incarcerated on December 15,

2017, after being charged with Aggravated Sexual Battery and subsequently Failure to Appear and Violation of Probation warrants. He entered a plea of nolo contend[e]re to the amended charge of Attempted Aggravated Sexual Battery on April 23, 2019.

Based on the facts set forth above, the Court concludes and finds that grounds for termination of parental rights do exist as to [Father], by clear and convincing evidence, pursuant to T.C.A. §36-1-113(g)(1), because [he] was in jail part or all of the four months just before the petition in this matter was filed on October 9, 2018. The father has engaged in conduct that exhibits a wanton disregard for the children's welfare by engaging in illegal behavior and drug use over the course of the children's lives as set forth above.

As set out above, the statute does not define "wanton disregard." *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at \*6 (Tenn. Ct. App. Apr. 25, 2005). Nonetheless, Tennessee courts have held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.,* 182 S.W.3d at 867-68. "Our courts have consistently held that an incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child." *Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at \*7 (Tenn. Ct. App. Jan. 11, 2005) (citing *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004)); *Dep't of Children's Servs. v. J.S.*, No. M2000-03212-COA-R3-JV, 2001 WL 1285894, at \*3 (Tenn. Ct. App. Oct. 25, 2001); *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000). Indeed, the enactment of Tenn. Code Ann. § 36-1-102(1)(A)(iv), *supra*, reflects the General Assembly's recognition that "parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and that "[i]ncarceration severely compromises a parent's ability to perform his or her parental duties." *In re Audrey S.*, 182 S.W.3d at 866. "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at \*3 (Tenn. Ct. App. June 9, 2015).

As discussed above, prior to his incarceration, Father engaged in illegal drug use and excessive use of alcohol. On at least two occasions, Father was found passed out with the Children in his sole care. Appellants led a transient lifestyle, staying with friends and in motels. Notwithstanding his incarceration, these actions demonstrate a wanton disregard for the Children. However, in March of 2016, Father received probation for initiation of the manufacture of methamphetamine. While the offense date

- 12 -

for this crime occurred before Jasmine was born, Father's violation of probation of this conviction after her birth is pertinent to this ground. *See In re Anthony R.*, M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004). The fact that Father's violation of probation stemmed from his sexual abuse of the Children's half-sister is particularly troubling. Father's abuse of Nichole led directly to his incarceration and clearly demonstrates a wanton disregard for the welfare of these Children. Father's drug and alcohol abuse, the transient nature of his lifestyle prior to incarceration, and the prurient nature of his crime against a minor provide clear and convincing proof and more than a sufficient basis for the trial court's termination of his parental rights on the ground of abandonment by wanton disregard for the welfare of the Children.

### C. Mother's Failure to Substantially Comply with the Requirements of the Permanency Plan

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of failure to substantially comply with the requirements of the permanency plan. Tennessee Code Annotated Section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan."

"[T]he permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." *In re C.S., Jr., et al.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id.* As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); *In re L.J.C.*, 124

S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548.

*Id.* at 656-57. The Tennessee Supreme Court has explained that

[s]ubstantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002).

As discussed above, Mother's requirements under the permanency plans were to: (1) pay $50.00 per month in child support; (2) complete drug and alcohol assessments and follow all recommendations; (3) complete mental health assessments and follow all recommendations; (4) complete domestic violence education classes; (5) participate in counseling and case management; (6) complete a psychological evaluation; (7) obtain stable housing; (8) submit to random drug screens; (9) take medication as prescribed; and (10) not engage in illegal activity and to follow the rules of probation and/or parole. The trial court ratified the plans and held that the requirements thereunder were reasonable and related to remedying the reasons for the Children's removal; this finding is not disputed.

Concerning Mother's failure to substantially comply with the foregoing requirements, in its order terminating her parental rights, the trial court found:

The testimony provided was that . . . permanency plans [were] developed throughout the entirety of this case, all of which the Court finds were in the best interests of the minor children and all of which also contained requirements for the parents that were reasonably related to remedying the reasons for foster care.
The testimony from the Department was that the mother did not pursue getting a hair follicle test despite being offered transportation and

- 14 -

assistance from the Department. The mother did not follow through with the alcohol and drug treatment program she had begun. The mother has not maintained stable housing since the children were placed in the Department's custody and has had multiple residences and stayed with various people. The mother did not have a mental health assessment as required, despite the Department offering to assist her with obtaining this service. The mother only took advantage of 54 hours of visitation with her children when over 140 hours were offered to her. The mother failed to remain in consistent contact with the Department, and there have been periods throughout this case where the mother's whereabouts were unknown despite diligent search efforts from the Department.

Based on the facts set forth above, the Court concludes and finds that grounds for termination of parental rights do exist as to [Mother], by clear and convincing evidence, pursuant to T.C.A. §36-1-113(g)(2), because she has not substantially complied with the responsibilities and requirements set out for her in the permanency plans prepared in this matter over the course of the case.

The evidence supports the trial court's findings. As discussed above, during the course of these proceedings, Mother was unable to obtain a suitable home for herself and the Children. From the time the Children were removed from her custody, Mother had at least five different addresses. At the time of the hearing, Mother was living with her paramour, Father's brother, and his son. Mother's paramour was previously incarcerated and was on probation for drug offenses. In addition, after the Children's removal, Mother was incarcerated three times—twice for driving without a license and once for violating the terms of her probation. As a result of the probation violation, Mother was sentenced on May 17, 2018. Mother's most recent incarceration prior to trial was in November of 2018 when she was incarcerated for one day, and she remained on supervised felony probation at the time of the hearing.

After the Children were removed from her custody, Mother continued to use illegal and prescription drugs, for which she had no prescription. At the hearing, Mother acknowledged the importance of drug treatment, especially given her history, but she maintained that she was addressing her drug abuse on her own. Although she attended some drug education classes, she was dismissed from the program for poor attendance. Mother never completed any drug programs. Mother tested positive for drugs several times: April 2018; May 29, 2018; September 17, 2018; and November 5, 2018. She refused another drug screen in January 2019. In the two months preceding the hearing on the petition to terminate her parental rights, i.e., February and March of 2019, Mother tested positive for methamphetamines, amphetamines, benzodiazepines, opiates, and Suboxone. In sum, out of twenty-six requests while the case was pending, Mother failed nine drug screens and refused another nine screens.

On appeal, Mother asserts that DCS failed to provide reasonable efforts to help her complete her responsibilities under the plans. In the first instance, proof of reasonable efforts is not a precondition to termination of parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 535 (Tenn. 2015). Nonetheless, from our review, DCS made numerous efforts to assist Mother. As discussed above, DCS approved her for various services, offered transportation assistance to visits, assessments, and appointments, helped with Mother's entrance into a detoxification facility, and provided and reviewed the permanency plan. Unfortunately, Mother did not reciprocate these efforts. For example, DCS approved Mother for sixty hours of services to work on items in the permanency plans, but she only used eight hours. When asked why she did not avail herself of all of the hours available, she answered, "I am not sure." Furthermore, Mother never completed a psychological evaluation. Although she admitted that she and Father had episodes of domestic violence in front of the Children, Mother did not complete a domestic violence education class. Mother did not complete an alcohol and drug assessment until February 26, 2019. The assessment recommended inpatient treatment, but Mother refused. Mother never completed any alcohol or drug treatment programs.

Mother paid some support for the children but acknowledged her payments were behind. Her first payment was made in July of 2018, nearly eight months after the Children were taken into DCS custody. The record shows that her payments were inconsistent and there were gaps of time between payments.

Mother participated in mental health counseling, but not until approximately two months before the hearing on the petition to terminate her parental rights. Mother attended some parenting classes, but, again, not until immediately before the hearing. Ms. Lowry, the DCS case worker, testified that Mother met none of her responsibilities under the plan. From our review, we agree. Based on the totality of the circumstances, we conclude that there is sufficient evidence to support the trial court's termination of Mother's parental rights on the ground of failure to substantially comply with the requirements of the permanency plans.

### D. Persistence of Conditions

The trial court also found that termination of Mother's and Father's parental rights was appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds* by *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of

the [parent], not whether the child can safely remain in foster care." ***In re K.A.H***., No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. When the termination petition was filed, the ground applied as a basis to terminate parental rights when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3)(A). Each of the statutory elements must be established by clear and convincing evidence. ***In re Valentine***, 79 S.W.3d 539, 550 (Tenn. Ct. App. 2002).

As discussed above, DCS filed a dependency-and-neglect petition on October 5, 2017. The trial court removed the Children from Appellants' custody on December 6, 2017. The Children were removed because Mother was non-compliant with services, the whereabouts of the Children were unknown, and DCS was unable to contact Mother after Father was incarcerated for child sexual abuse.

- 17 -

In its order terminating her parental rights, the trial court found:

> The children have been removed, at the time of this hearing, for over 16 months. During this time and at the time of this hearing, the mother has not established a suitable home and still has not had any alcohol and drug treatment. The mother never followed through with the services offered to her, including consistent visitation with the children, a hair follicle drug test, and inpatient alcohol and drug treatment. The conditions that caused the children to be removed from [Mother's] custody persisted and were still in place at the time of the hearing.
>
> [Father] was still incarcerated as of this hearing, and had been since December 15, 2017. He has taken some classes while incarcerated and participated in a psychosexual evaluation, but has not established suitable housing for the children or demonstrated he is appropriate to parent them. His wanton disregard of the minor children's best interests, as shown through his continuing to incur criminal charges including a charge for sexually abusing their half-sister, indicate that he has been more concerned about himself and his desires than his children's needs.
>
> Based on the facts set forth above, the Court concludes and finds that grounds for termination of parental rights do exist as [both Mother and Father], by clear and convincing evidence, pursuant to T.C.A. §36-1-113(g)(3), because it has been more than 16 months since the removal of the children from [Mother and Father], and the conditions that led to the removals still persist and other conditions in these homes exist that, in all reasonable probability, would lead to further neglect or abuse of the children.

As discussed above, Mother never obtained safe and stable housing for the Children even though the removal was based, in part, on a lack of suitable housing. From the time the Children came into DCS custody on December 6, 2017 until the trial in April of 2019, Mother could not recall how many addresses she had but estimated about five. As of February of 2019, Mother was involved with Father's brother, who also has a history of criminal activity involving drugs. Although Mother testified that she and Nathan P. had procured suitable housing, she could not remember the address and provided no proof of a lease or utilities. Nonetheless, Mother insisted: "I am successful now. I mean I am a little late on it . . . But I've just now got a very decent place for them to live." Ms. Lowry explained that, during the pendency of this case, Mother had given her numerous potential future addresses that never materialized.

In addition to the lack of stable housing, Mother failed to maintain sobriety even though the Children's removal was based, in part, on drug abuse. Mother abused drugs throughout the case. She tested positive for illegal drugs in April 2018, May 2018, September 2018, and November 2018. Mother did not complete an alcohol and drug

- 18 -

assessment until February 26, 2019. The assessment recommended inpatient treatment that Mother refused to attempt. At the time of the hearing, Mother had not completed a drug and alcohol treatment program, but she insisted that she was addressing the issue on her own. The fact that Mother tested positive for methamphetamines, amphetamines, benzodiazepines, opiates, and Suboxone in the two months immediately preceding the hearing on the petition to terminate her parental rights indicates that her approach to sobriety is not working.

The foregoing concerns persisted throughout the proceedings up to the time of the hearing on the petition to terminate parental rights. From the time the Children were removed from her custody, Mother had more than a year to avail herself of the resources provided by DCS and to work toward reunification with her Children; however, by her own testimony, at the time of trial, she was still not in a position to care for the Children. Given Mother's history, there is no evidence that the conditions that led to the Children's removal will be remedied by Mother at any early date. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i).

Finally, the continuation of the child-parent relationship would diminish the Children's chances of integration into a safe, stable home. At trial, Mother had no home for herself and the Children. By contrast, the Children have been in a continuous foster-home placement from March of 2018 until the hearing. At the time of hearing, the Children were four and two-and-one-half years old and had lived with the foster parents for over thirteen months. Ms. Lowry observed the Children's interactions with their foster parents and testified that there was a strong bond.

Perhaps most telling is the following portion of Mother's testimony:

Q. [Y]our children have been in custody since December of 2017. How long should they have to wait for you to get yourself together?

A. They have waited long enough.

We agree, as did the trial court, that Mother has had ample opportunity to remedy the conditions that led to the Children's removal, but she has made no significant efforts toward that goal. As such, we conclude that there is sufficient evidence to support the trial court's termination of her parental rights on the ground of persistence of the conditions that led to the Children's removal.

The trial court also terminated Father's parental rights on this ground. Father was incarcerated from December 15, 2017 until the date of the hearing. Prior to his incarceration, Father had no stable home for the Children. Before DCS removed the Children, Father described his living arrangements with Mother and the Children as "bouncing around from place to place." For several months, Father, Mother, and all four

- 19 -

children lived with Ray S. in a two-bedroom, one-bathroom house. Due to allegations of sexual abuse by Father against his stepdaughter, Ray S.'s daughter Nichole, Father, Mother, and the Children moved out of Ray S.'s home. During his testimony, Father acknowledged that the Children were removed because of Father's and Mother's instability. As discussed above, because of his incarcerations, Father was unable to provide a home for the Children at any point during the pendency of this case. Furthermore, Father abused illegal and prescription drugs. Father admitted his use of marijuana and un-prescribed Suboxone before the Children were removed in December 2017 but claimed his last use was November 8, 2017.

Moreover, Father has a history of criminal activity and incarceration that continued throughout this case. Father violated his probation due to the sexual abuse he perpetrated against Nichole. At the time of the hearing, Father claimed that he anticipated being released from incarceration within the month. However, on further inquiry, it was revealed that he was being held without bond for an amended probation violation after entering the no-contest plea to attempted aggravated sexual battery. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). Father recognized that because of his criminal conduct: "[t]here's nothing I can possibly do for my children at this moment until I am released."

Based on Father's incarcerations and inability to remedy any of the reasons the Children were removed, continuation of the child-parent relationship would diminish the Children's chances of integration into a safe, stable home. Father's testimony on this subject is telling:

> Q. I asked a similar question to [Mother] that I will ask of you. How much longer should your children have to wait for you to get your life together before they have a permanent, stable home?
>
> A. They shouldn't have to wait at all.

For the foregoing reasons, we conclude that there is sufficient evidence to support the trial court's termination of Father's parental rights on the ground of persistence of the conditions that led to the Children's removal.

**E. Severe Child Abuse by Father**

The trial court found, by clear and convincing evidence, that Father's parental rights should be terminated on the ground of severe child abuse. Tenn. Code Ann. § 36-1-113(g)(4). Tennessee Code Annotated section 36-1-113(g)(4) provides that a ground for terminating parental rights exists if:

The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4). Tennessee Code Annotated section 37-1-102 defines "severe child abuse," in relevant part, as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(22)(A)(i).

In its order terminating Father's parental rights, the trial court found:

Based on the facts set forth herein, the Court concludes and finds that grounds for termination of parental rights do exist as to [Father], by clear and convincing evidence, pursuant to T.C.A. §36-1-113(g)(4), because this Court entered an order on July 16, 2018, where [Father] was found to be a perpetrator of severe abuse against the now 8 year old half-sibling of his daughters, and he did not appeal said finding. He also entered a plea of nolo contend[e]re to the corresponding offense of Attempted Aggravated Sexual Battery on April 23, 2019.

We agree. On June 27, 2018, the Children were adjudicated dependent and neglected and found to be the victims of severe child abuse perpetrated by Father based, in part, on Father sexual abused of the Children's half-sister. Father entered a no-contest plea to attempted aggravated sexual battery of Nichole and received a six-year sentence. Because of his plea, Father was placed on the Sex Offender Registry. Accordingly, the issue of whether Father committed severe child abuse is *res judicata*, and the trial court properly relied on the prior adjudicatory order to terminate Father's parental rights on this ground. *See* **In re Heaven L.F.**, 311 S.W.3d 435, 439-440 (Tenn. Ct. App. 2010) (holding that the doctrine of *res judicata* applies "to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action) (citing **State v. Tate**, No. 01-A-01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. Ct. App. Mar. 31, 1995). Therefore, we conclude that the trial court did not err in terminating Father's parental rights on the ground of severe child abuse.

## VI. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. **White v. Moody**, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). As the Tennessee Supreme Court explained:

Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d)(2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to this appeal, these factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has made such an adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status

would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support . . . .

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. Aug. 11, 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S*., 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d at 194.

In its order terminating their parental rights, the trial court found:

> Here, the Court concludes that termination [of Appellants' respective] parental rights is in the children's best interests by clear and convincing evidence. In determining the issue of best interest the court considered all of the testimony as well as the statutory factors in T.C.A. § 36-1-113(i).
> The Court finds that there has been little adjustment, if any, of the circumstances, conduct, or condition of the parents. [Mother] has not obtained treatment to address her drug abuse and has not established a suitable home. [Father] recently entered a plea to attempted aggravated sexual battery of a minor and is incarcerated on a violation of probation charge. He has not established a safe and stable home for the children. There has not been a lasting change or adjustment of the parents despite the reasonable efforts made by the Department.
> [Father] recently entered a plea to attempted aggravated sexual battery of his daughter's now 8 year old half-sibling which concludes there is brutality and abuse in the home. [Mother] has not provided proof of her sobriety and has consistently abused drugs throughout this case. There is also no evidence she has complied with mental health services.

- 23 -

[Father] has not seen the children since they were removed due to his incarceration. Even during the short period he was out of jail during the children's stay in foster care, he made no efforts to visit the children or to improve his personal situation such that he could be a placement option for the children.

[Mother] has not maintained regular visitation with the children and only participated in approximately 54 hours of visits with her children when she was offered over 140 hours. There is no meaningful relationship between the minor children and either parent. The children have been in custody for over 16 months, which amounts to over half of Jasmine's life.

The children are in a good home that is committed to adopting the children, if available for adoption, and any change from that home would be detrimental to the children.

As discussed above, neither parent has made any significant adjustment of circumstance, conduct, or conditions so as to make it safe and in the Children's best interests to be in their home, and both have failed to effect a lasting adjustment after reasonable efforts by DCS. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(2). Mother did not have a suitable home for the Children when they were removed and did not have one at the time of trial. Mother never engaged in the therapies and counseling required under the permanency plans, and throughout these proceedings, she continued to test positive for drugs.

Father was incarcerated from December 15, 2017 until the date of the hearing. Although Father completed some classes and evaluations, he acknowledged that his incarceration was a hurdle to completing his other responsibilities under the parenting plans. As such, there is no proof that Father has such an adjustment of circumstance, conduct, or conditions as to make it safe and in the Children's best interests to be in his custody or care.

The record indicates that neither parent has maintained regular visitation with the Children, and no meaningful relationship exists between the Children and Appellants. *See* Tenn. Code Ann. § 36-1-113(i)(3) & (4). Although she was offered 140 hours of visitation while the Children were in custody, Mother only visited for 54 hours. Mother blamed a lack a lack of transportation for her missed visits, but Ms. Lowry testified that DCS offered to assist Mother with transportation if she requested it 48 hours in advance. Mother explained the lack of visits at trial stating: "I wasn't getting my life together until recently, honestly. I'm just now getting things the way they're supposed to be. I know it's kind of late." On some occasions, Mother would not attend a scheduled visitation and would provide no notice to DCS. Mother acknowledged that her failure to attend scheduled visits would disappoint the Children. After the Children were removed by DCS, due to his incarceration, Father never visited them, but he did write occasional letters and poems to the Children.

- 24 -

Father committed severe abuse. *See* Tenn. Code Ann. § 36-1-113(6). On June 27, 2018, the Children were adjudicated to be dependent and neglected and found to be the victims of severe child abuse perpetrated by Father. Father entered a no-contest plea to attempted aggravated sexual battery of Nichole, a child in his household, and received a six-year sentence. Based on his plea, Father was placed on the Sex Offender Registry.

From the record, Appellants' physical environments are not healthy or safe, and drug abuse could render the parents consistently unable to care for the Children. *See* Tenn. Code Ann. § 36-1-113(7). Father was incarcerated and had no home. Mother was planning to move into a house with Father's brother, who was also involved in criminal activity involving drugs. Mother provided no proof of a lease or utilities at the new house and could not recall the address.

Furthermore, the Appellants' mental health and emotional status prevented them from providing safe and stable care for the Children. *See* Tenn. Code Ann. § 36-1-113(8). Mother participated in mental health counseling, but not until two months before the hearing on the petition to terminate her parental rights. Father never completed a mental health assessment.

Neither parent paid child support consistent with the guidelines. *See* Tenn. Code Ann. § 36-1-113(9). Father paid no support for the Children. Mother paid some support for the Children but acknowledged her payments were behind. She made her first payment in July of 2018, which was almost eight months after the Children were placed in DCS custody. Her payments were inconsistent, and there were gaps of time between payments.

Finally, we agree with the trial court that a change of caretakers would be detrimental to the Children. *See* Tenn. Code Ann. § 36-1-113(5). Since March 2018, the Children have been in a continuous foster-home placement. At the time of trial, the Children were four and two-and-a-half years old and had lived with the foster parents for over thirteen months. Ms. Lowry observed the Children's interactions with their foster parents and testified that there was a strong bond. The Children's foster mother testified that she and her husband love the Children. The Children interact well with the foster parents and the other children in the home. The Children attend daycare, and the foster parents are open to adopting the Children.

Based on the foregoing facts, we conclude that there is clear and convincing evidence to support the trial court's determination that termination of Appellants' respective parental rights is in the Children's best interests.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Appellants' respective parental rights to the two minor Children. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed one-half to Appellant, Brittney S., and one-half to Appellant, Roman P. Because Brittney S. and Roman P. are proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE